**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | |
|---|---|
| BIOMET 3i, LLC, *et al.*,        ) | |
|                 ) | |
|        Plaintiffs,      ) | |
|                 ) | |
| v.                    ) | No. 1:16-cv-00125-TLS-SLC |
|                 ) | |
| HEATHER LAND,        ) | |
|                 ) | |
|        Defendant.     ) | |

## REPORT AND RECOMMENDATION

Before the Court is a motion for preliminary injunction filed by Plaintiffs Biomet 3i,

LLC, and Zimmer US, Inc. (together, "Zimmer Biomet"). (DE 8). In its motion, Zimmer Biomet

requests a preliminary injunction that enjoins Defendant Heather Land from continuing to work

for Keystone Dental and from making any further breaches of the Confidentiality, Non-

Competition and Non-Solicitation Agreement for Sales Managers and Representatives (the "2015

Agreement") entered into by Zimmer Biomet and Land on November 12, 2015. Zimmer Biomet

filed a brief with affidavits and exhibits in support of its motion for preliminary injunction. (DE

9, DE 10, DE 11, DE 12). Land filed a response in opposition. (DE 47). This matter was

referred to the undersigned for a report and recommendation pursuant to 28 U.S.C. §

636(b)(1)(B). (DE 25). An evidentiary hearing was held on July 11-12, 2016. (DE 49, DE 50).

Both Zimmer Biomet and Land have filed post-hearing briefs (DE 58, DE 60, DE 62) and

replies (DE 65, DE 66). For the following reasons, I will RECOMMEND that Zimmer Biomet's

motion for preliminary injunction be GRANTED.

## I. FINDINGS OF FACT

Zimmer Biomet is a company that makes musculoskeletal products, with multiple

divisions within the company, including a dental division. (Transcript[1] ("Tr.") 10-11). In June

of 2015, the formerly separate companies merged when Zimmer U.S.A., Inc., acquired Biomet,

Inc. (Tr. 11). Biomet 3i, LLC, the division of Biomet that focused on dental implants and oral

reconstructive surgery, was owned by Biomet, but is now owned by Zimmer Biomet. (Tr. 11).

Zimmer Biomet is headquartered in Warsaw, Indiana. (Tr. 21). Biomet 3i, LLC, was

headquartered in Palm Beach Gardens, Florida, prior to the Zimmer Biomet merger. (Tr. 247).

Zimmer Biomet's dental offices are now based in Palm Beach Gardens, Florida. (Tr. 247).

Zimmer Biomet's dental division has competitors in the industry that also sell dental implants,

including Keystone Dental, Nobel Biocare, Straumann, and Dentsply. (Tr. 15). Zimmer Biomet

uses a system of territory sales representatives, regional managers, and corporate sales managers

to sell its products to customers. (Tr. 13-15).

Land was hired by Implant Innovations, Inc., the predecessor to Biomet 3i, LLC, in 2005.

(Tr. 266). Land served as the territory sales manager for the San Diego County area for Implant

Innovations, Inc., for about two years. (Tr. 266-67). Land then took a similar position with a

company called Osteohealth, where she received training about regenerative products. (Tr. 267).

Land worked for Osteohealth for a little over a year. (Tr. 267). Land's next job was with a

dental software company for a short period of time, before she was recruited to come back to

Biomet 3i, LLC. (Tr. 267). Land returned to Biomet 3i, LLC, in 2008 as a territory sales

manager for the lower part of western Washington. (Tr. 267-68). After about a year and a half

or two years, Land added the rest of western Washington as well as Alaska to her territory. (Tr.

---

[1] The unredacted transcript from the July 11-12, 2016, evidentiary hearing has been filed
in the record in two parts, with one part for each day of the hearing. (DE 72, DE 73). A redacted
version of the transcript has also been filed in the record in two parts. (DE 81, DE 82).

268).  During that time, Land also served as a field training manager, which required her to mentor and teach new hires.  (Tr. 268).

In 2011, Land was promoted to a regional sales manager position with Biomet 3i, LLC. (Tr. 268-69).  Land's territory as regional sales manager initially consisted of only southern California, but her territory later expanded to include Arizona and Hawaii.  (Tr. 269).  Land was employed as a regional sales manager for Biomet 3i, LLC, until October 31, 2015.  (Tr. 269). Her duties as regional sales manager included coaching and mentoring her direct reports, going into the field, working and meeting with customers to help them grow their practices, and developing relationships with the customers.  (Tr. 26).

Land became a corporate sales manager for the newly merged Zimmer Biomet in November 2015.  (Tr. 39).  Land's geographical territory changed to include Alaska, Arizona, California, Colorado, Hawaii, Idaho, Minnesota, Montana, Nevada, North Dakota, Oregon, South Dakota, Washington, Wisconsin, and Wyoming.  (Tr. 39).  As a corporate sales manager, Land handled institutional accounts for Zimmer Biomet, including accounts for the military, universities, dental service organizations ("DSO's"), and group dental practices.  (Tr. 293).  Part of Land's job as a corporate sales manager was to interface directly with executive officers for these institutional accounts in order to understand their preferences and work with them on their businesses.  (Tr. 28).

Zimmer Biomet provided Land with "key accounts, a list of customers, what they purchase, when they purchase, what type of products they purchase, how many units of a product they purchase throughout a year," as well as information about Zimmer Biomet "products as it pertains to selling versus other competitive products, coming out with education strategies,

marketing campaigns, strategic planning," the development of new products, and both general pricing and pricing specific to each account. (Tr. 45-46). All of this information is information that is valuable to Zimmer Biomet and is not available to the public, and a competitor's access to this information would be harmful to Zimmer Biomet. (Tr. 46-47). Land also would have had access to non-written confidential information through meetings and trainings she attended, through speaking with other people within Zimmer Biomet, and through speaking with Zimmer Biomet's customers. (Tr. 47).

Land has been subject to a non-competition, non-solicitation, and non-disclosure agreement with Biomet 3i, LLC, since 2008. (Tr. 138). When Land accepted the corporate sales manager position with Zimmer Biomet in November 2015, Land signed a new non-competition, non-solicitation, and non-disclosure agreement ("the 2015 Agreement," as previously defined). (Tr. 142; Pl. Ex. 18). Under the 2015 Agreement, Land agreed that: (1) for a period of 18 months after termination of her employment with Zimmer Biomet, she would not compete by working for a competitor in the same geographic territory she covered at any time during her last two years of employment (Pl. Ex. 18 ¶ 7(b)(1)); (2) for a period of 18 months after termination of her employment with Zimmer Biomet, she would not directly or indirectly solicit Zimmer Biomet's customers or prospects with whom she worked or for whom she held supervisory or managerial responsibilities during the last two years of her employment (Pl. Ex. 18 ¶ 7(b)(2)); (3) she would not disclose confidential information that she was exposed to through her work at Zimmer Biomet (Pl. Ex. 18 ¶ 2); and (4) Indiana law would apply to any dispute arising out of the 2015 Agreement (Pl. Ex. 18 ¶ 13).

Land was recruited to interview with Keystone Dental in January 2016, just a few months

after beginning her corporate sales manager role with Zimmer Biomet. (Tr. 142). The recruiter sent Land's resume to Keystone Dental in mid-January 2016. (Tr. 143). On February 10, 2016, Land had a formal interview with Keystone Dental in Irvine, California, with Keystone Dental's Vice President of Sales, Steve Wright, the Director of Human Resources, the Vice President of Marketing, and the Director of Corporate Sales. (Tr. 143). Land had a followup call with Wright a day or two later. (Tr. 143). During mid-February, Land was working with Wright to schedule a final interview with Keystone Dental's President, Mike Kehoe. (Tr. 144). On February 15, 2016, Wright emailed Land stating that "[Keystone Dental's] lawyer says as long as you were living in California when you signed the Non-compete Agreement, it will not hold up in court. California is a right to work state. So they will make noises, but you have the right to work for whomever you wish." (Pl. Ex. 25; Tr. 144).

On February 16, 2016, the next day, Land transferred 5,948 Zimmer Biomet files onto a flash drive, including information that Land admits was confidential. (Tr. 153-54, 204). Land created the flash drive of Zimmer Biomet files within a few days of when she was told by Keystone Dental that it was going to offer her a job. (Tr. 155). Land states that she created the flash drive as part of a backup process that she did on a regular basis. (Tr. 154). However, Land does not have any other flash drives on which she previously backed up her Zimmer Biomet files, and she had never previously backed up files on that particular flash drive. (Tr. 155-56).

Land received a formal written job offer for a position as a Regional Sales Manager with Keystone Dental on February 23, 2016. (Tr. 145; Pl. Ex. 33). Land sent a response accepting the position within four hours, as she had been previously told by Keystone Dental that she was going to receive an offer, so she was expecting it. (Tr. 146). Land gave her notice of resignation

to Zimmer Biomet the next day, on February 24, 2016, when she called Jim Gerson, who was her team lead. (Tr. 147; Pl. Ex. 36). Gerson told Land to send a formal letter of resignation, and to speak with Adam Larkin, who was her direct supervisor at the time. (Tr. 118, 147). Gerson asked Land if she would be calling on institutional accounts in her new job, and Land informed him that she had already informed Keystone Dental that she could not work on those accounts. (Tr. 298).

Land also spoke with Zimmer Biomet's general manager for North America, Brian Burke, as well as Brett Deaver, Zimmer Biomet's Vice President of Global Marketing and Education, whom Land considered to be a close friend. (Tr. 300-01). During her conversation with Burke, Land could tell he was "very disappointed," but "he really didn't say a whole lot." (Tr. 302). Gerson then got back to Land and let her know that Zimmer Biomet wanted her to stay on an additional 8 or 9 days, until March 1st, to allow time to transition. (Tr. 302). During this transition period, Zimmer Biomet did not put any restrictions on what activities Land could do or what information she could access. (Tr. 303-04). Land completed an exit interview with Sandi Thompson in Zimmer Biomet's human resources department. (Tr. 305-06).

Land did not ask anyone at Zimmer Biomet whether she had their approval to work for Keystone Dental. (Tr. 151-52). Land inferred from her conversations with Zimmer Biomet employees that Zimmer Biomet did not have a problem with Land working for Keystone Dental as long as Land did not work on the institutional accounts. (Tr. 151-52). However, no one at Zimmer Biomet ever told Land that Zimmer Biomet had no problem with her taking the position at Keystone Dental. (Tr. 149). When Land spoke with Burke, she never asked him if it was okay for her to take the job at Keystone Dental, and she never asked if Zimmer Biomet would enforce

the non-compete agreement against her. (Tr. 63). Land believed that the non-compete agreement was unenforceable in California because she had spoken to Biomet's director of human resources, Thea Bosio, during her time as a regional manager for Biomet. (Tr. 287-88). During Land's work as a regional manager, Biomet had not enforced non-compete agreements against some of Land's territory sales representatives in California. (Tr. 288).

On February 25, 2016, Adam Larkin sent an email to Zimmer Biomet's Human Resources department with Land's resignation letter attached. (Pl. Ex. 37). In his email, Larkin stated that "Heather has taken a position with Keystone Dental as a manager/director over a sales team. I don't know if this is an issue or not with Heather's recently signed Non-Compete Agreement, but I believe we should at least look into it." (Pl. Ex. 37). Zimmer Biomet also got legal counsel involved into looking into whether Land's new position at Keystone Dental violated her non-compete agreement. (Tr. 62).

Land began working for Keystone Dental on March 3, 2016. (Tr. 307). On March 5, Land opened several Excel files from the flash drive, including a June 2015 discount calculator and an "Acquire, Expand, Retain" ("AER") business strategy form. (Tr. 205; Pl. Ex. 81). Land admits to having transferred some files from the flash drive to her personal computer for use at Keystone Dental as templates. (Tr. 171, 312). Soon after she began working for Keystone Dental, on March 14, 2016, Land received an email from Jason Hyland, Keystone Dental's corporate sales manager who was responsible for institutional accounts. (Tr. 186-88). In that email, Hyland stated that he was sending Land reports regarding her representatives' sales for DSO accounts. (Tr. 187-88; Pl. Ex. 44 at 2). Hyland further stated in the email that he looked forward to meeting with Land later that week at the corporate office, when he could break down

the national account numbers even more for her.  (Pl. Ex. 44 at 2).

Within weeks of starting her job with Keystone Dental, Land started telling her representatives to specifically target Zimmer Biomet accounts.  (Tr. 174).  On March 15, 2016, Land sent an email to her team of sales representatives stating:

> Zimmer Biomet is losing Miami Tissue Bank.  Miami tissue bank has obtained an orthopedic contract that is more profitable and thus, is leaving the dental market.  Many of these products are now on backorder with legacy Biomet customers and no longer available.  This is an opportune time to go after this business as they will need another bone provider.  It is doubtful that many of these doctor[s] will want to switch to Puros due to its higher price point. Go find these accounts and convert this business!  Happy Hunting!

(Tr. 174; Pl. Ex. 45).  Land sent another email to her sales team on March 18, 2016, stating:

> Please direct your sales efforts to going after BIOMET 3i accounts for implants and biomaterials.  These accounts are highly frustrated with the Zimmer merger and product issues of late:
>
> Rep:
> *May have lost their BIOMET rep in the territory realignment. Most customers not happy with Zimmer rep replacement.
>
> Education:
> BIOMET education has drastically changed and will no longer support customer programs as they had in the past.  Customers are very upset over this if they were part of their education programs. We can pick up where BIOMET left off.  Let's strategize if you come across this customer.
>
> Product issues/recalls on the following:
> *Entire Restorative product line recalled due to package sterility issue.
> *EndoBon recalled due to FDA requirement that they move to 1 ½ yr shelf life vs 3 yr shelf life without more studies.
> *Provide abutment impression and protective cap recall due to negative tissue response.
> *Miami Tissue Bank going away.

> Now is the time to strike on these accounts. I am happy to meet
> with any of these accounts you can get a meeting with. Just let me
> know.

(Tr. 178; Pl. Ex. 48).

On March 24, 2016, Land sent an email to a Biomet customer, Dr. Polyakov, which

stated:

> I hope you're doing well. I wanted to update you and let you know
> I've moved to Keystone Dental. They remind me of 3i in the old
> days. Keystone can do a lot with education that ZB can no longer
> do. Let me know if you would be interested in meeting. If nothing
> else we have some proprietary products that could supplement
> what you're already doing.

(Pl. Ex. 52). Dr. Polyakov responded to Land the next day, on March 25, 2016. He wrote:

> Good to hear from you. I am sorry to hear that you left Biomet 3i, I
> think that they lost a great employee and an amazing person as
> well. I am not ready to consider any other implant company at this
> time, but, please, keep in touch and keep me updated on your
> career.

(Pl. Ex. 52). Land responded with a final email, stating:

> I appreciate your kind words. It was a difficult decision to leave
> but ultimately it was a very good move for me. The people and
> company ethics are very high quality with a family like
> environment.
>
> I will keep in touch and hope you do the same. I will miss working
> with you all. Hopefully I will see you at AAOMS this year. If you
> go, please stop by the booth.

(Pl. Ex. 52).

Also on March 25, 2016, Zimmer Biomet's counsel sent Land a letter informing her that

they were concerned her employment with Keystone Dental may be in violation of her non-

compete agreement. (Tr. 151, 306). No one at Zimmer Biomet had previously expressed

concerns to Land about her new job at Keystone Dental. (Tr. 306). Land responded, through Keystone Dental's counsel, on April 4, 2016. (Pl. Ex. 57). In the letter, Keystone Dental's counsel stated that California law would apply to the case, and thus the 2015 Agreement would be unenforceable; the letter also stated that the 2015 Agreement was unenforceable because it was obtained under duress. (Pl. Ex. 57). At that point, Zimmer Biomet initiated this action against Land by filing its complaint on April 12, 2016. (DE 1).

On April 11, 2016, Land emailed Steve Wright regarding a request from another Keystone Dental employee to permit a specific physician, Dr. Craig Thiede, to attend a symposium. (Tr. 182; Pl. Ex. 58). In her email, Land noted that Dr. Thiede was "on a major growth rate from last year as he has switched from BIOMET to Keystone as his primary implant," and thus she expected that Dr. Theide would be "a good growth account" if Keystone Dental builds loyalty with his referrals. (Pl. Ex. 58).

On April 12, 2016, Jason Hyland sent Land another email, thanking her for the input she had provided. (Pl. Ex. 44 at 1). Hyland also attached the national account revenue numbers for each representative during 2015 and 2016, as well as a file that would permit Land to determine the name of the national account for each association number. (Pl. Ex. 44 at 1).

## II. DISCUSSION

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (internal citations omitted). "In assessing whether a preliminary injunction is warranted, we must consider whether the party seeking the injunction has demonstrated that '1) it has a reasonable likelihood of success on the merits; 2) no adequate remedy at law exists; 3) it will suffer irreparable harm if it is denied; 4) the irreparable

harm the party will suffer without injunctive relief is greater than the harm the opposing party will suffer if the preliminary injunction is granted; and 5) the preliminary injunction will not harm the public interest.'" *St. John's United Church of Christ v. City of Chi.*, 502 F.3d 616, 625 (7th Cir. 2007) (quoting *Linnemeir v. Bd. of Trs. of Purdue Univ.*, 260 F.3d 757, 761 (7th Cir. 2001)). The district court must exercise its discretion to arrive at a decision "based on a subjective evaluation of the import of the various factors and a personal, intuitive sense about the nature of the case." *Lawson Prods., Inc. v. Avnet, Inc.*, 782 F.2d 1429, 1436 (7th Cir. 1986).

The decision-making process also involves a "sliding scale" analysis, at least to the extent that "the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh toward its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 12 (7th Cir. 1992) (citations omitted). "The sliding scale approach is not mathematical in nature, rather 'it is more properly characterized as subjective and intuitive, one which permits district courts to weigh the competing considerations and mold appropriate relief.'" *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 895-96 (7th Cir. 2001) (quoting *Abbott Labs.*, 971 F.2d at 12). But there is still a threshold to be met. A total failure to meet any one of the test's requirements cannot be compensated by a strong showing with respect to another. *See, e.g., East St. Louis Laborers' Local 100 v. Bellon Wrecking & Salvage Co.*, 414 F.3d 700, 703 (7th Cir. 2005) (holding that, if a moving party cannot show that there is irreparable harm and no adequate remedy at law, "a court's inquiry is over and the injunction must be denied"); *Jolivette v. Husted*, 694 F.3d 760, 765 (6th Cir. 2012) ("Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal.").

Land raises two preliminary arguments, lack of standing and estoppel, in her post-hearing brief in opposition to Zimmer Biomet's motion for preliminary injunction. The Court will turn to these arguments first, before considering Zimmer Biomet's likelihood of success on the merits and other requirements for a preliminary injunction to issue.

### A. Standing

Land's first initial argument is that neither Plaintiff has standing to enforce the 2015 Agreement. Land contends that the parties to the 2015 Agreement are Plaintiff Zimmer US, Inc., and Land herself, not Plaintiff Biomet 3i, LLC. Because Land, Gerson, and Burke testified at the evidentiary hearing that their current employer remained Biomet 3i, LLC, even after the merger, Land believes that the Plaintiffs in this case do not have standing to enforce the 2015 Agreement, as Biomet 3i, LLC, was not a party to the 2015 Agreement, and Zimmer US, Inc., was not her employer. Land argues that covenants not to compete will not be enforced unless they are "ancillary to an *employment* relationship," and thus contends that Zimmer US, Inc., does not have standing to enforce the 2015 Agreement because it was not her employer. (DE 62 at 13 (citing *Ohio Valley Commc'ns v. Greenwell*, 555 N.E.2d 525 (Ind. Ct. App. 1990))).

"In Indiana, 'only the parties to a contract, those in privity with the parties, and intended third-party beneficiaries under the contract may seek to enforce the contract.'" *Benefit Resource Grp., Inc. v. Westfield Ins. Co.*, No. 2:11-CV-64, 2013 WL 1813963, at *4 (N.D. Ind. Apr. 26, 2013) (quoting *Harold McComb & Son, Inc. v. JP Morgan Chase Bank, NA*, 892 N.E.2d 1255, 1258 (Ind. Ct. App. 2008)). Here, the 2015 Agreement was signed by Heather Land as the "Employee," and by Matthew Wilson for the "Company." (Pl. Ex. 18 at 11). The "Company" was defined in the 2015 Agreement to include Zimmer US, Inc., Zimmer, Inc., as well as each of

12

their affiliates, parents, and both direct and indirect subsidiaries, specifically including Biomet, Inc., and its affiliates, parents, and both direct and indirect subsidiaries, as well as any successors-in-interest. (Pl. Ex. 18 ¶ A). Furthermore, the 2015 Agreement states that "[t]he Company has offered Employee employment, contingent upon Employee's entering into this Agreement." (Pl. Ex. 18 ¶ B). Thus, the 2015 Agreement was most certainly "ancillary" to her employment relationship with Zimmer Biomet, as it was a requirement of her job offer for the corporate sales manager position. Based on the clear language of the 2015 Agreement, both Zimmer US, Inc., and Biomet 3i, LLC, are parties to the contract, and they each have standing to enforce the 2015 Agreement.

### B. Estoppel

Land's second initial argument is that Zimmer Biomet is equitably estopped from enforcing the non-competition covenant in the 2015 Agreement against her, because she contends that Zimmer Biomet's actions and silence induced her to believe that Zimmer Biomet had no objection to her acceptance of the position with Keystone Dental. Land argues that her reliance on Zimmer Biomet's actions and silence was both reasonable and to her detriment, and accordingly contends that Zimmer Biomet should be estopped from enforcing the non-competition covenant.

Land focuses on the following "actions and silence" by Zimmer Biomet: (1) Land's conversations with Biomet's human resources manager, Thea Bosio, who told her that non-compete agreements were not enforceable in California; (2) Land's contention that Biomet "had never previously enforced non-compete agreements against employees in California," and Land "had no reason to think Biomet's views on this had changed"; (3) Land's conversation with

Gerson, who only expressed a concern about her working on institutional accounts, not about her taking a job at Keystone Dental; (4) no one else at Zimmer Biomet (Burke, Deaver, Larkin, and Thompson) had expressed concern about her taking the job at Keystone Dental; (4) Zimmer Biomet's "hid[ing] the ball" via communications between executives at Zimmer Biomet regarding their intent to enforce the non-competition covenant against her, without informing her of that intent, "despite multiple opportunities before she resigned"; and (5) Zimmer Biomet's delay in contacting Land to question her right to work for Keystone Dental until after she had been working at Keystone Dental for three weeks. (DE 62 at 15-16).

Land argues that Zimmer Biomet acted in a way that made Land believe it did not intend to enforce the non-competition restriction, and Zimmer Biomet therefore was obligated to inform Land that she could not rely on its prior actions and silences. Land contends that it is the duty of the individual holding a right to assert that right if someone is about to infringe upon it, citing to a more than 20-year-old, unpublished Northern District of Illinois case, *TIC United Corp. v. Lisowski*, No. 93 C 6365, 1994 WL 577255, at *6 (N.D. Ill. Oct. 18, 1994), in support. Land also cites to a "conceptually similar case" from the District of Oregon, which she states stands for her position that an employer is equitably estopped from asserting its rights under a non-competition agreement where the employer induced its former employees to believe that they could work for a competitor without fear of violating the agreement. (DE 62 at 17 (quoting *Ikon Office Sols., Inc. v. Am. Office Prods., Inc.*, 178 F. Supp. 2d 1154, 1165 (D. Or. 2001))). Land states that "this case is why equitable estoppel exists." (DE 62 at 17).

In response, Zimmer Biomet contends that it never waived its rights under the 2015 Agreement. Zimmer Biomet argues that it never had intent to waive its contractual rights, and

cites to case law supporting its argument that the intent of the non-breaching party is a key element of waiver. (DE 65 at 8). Zimmer Biomet also brings the Court's attention to Land's strategic—and perhaps misleading—citation to *Ikon Office Sols.*, a case in which the employer "expressly informed the employee that there was no such agreement" when the employee had asked the employer for a copy of his non-competition agreement. (DE 65 at 9). Zimmer Biomet distinguishes that case, where the employer told the employee there was no non-compete agreement, and then sought to enforce the agreement after the employee left to work for a competitor, from this one, where Land was never told she did not have a non-competition agreement. Zimmer Biomet notes that Land "knew she had [a non-competition agreement] and provided a copy of it to Keystone." (DE 65 at 9). Zimmer Biomet also argues that Land did not resign based on any action by it or its employees; rather she resigned on her own volition. Zimmer Biomet also distinguishes the instant case from *TIC United Corp.*, which Land cited to, on the basis that it involved "a situation where the employee had not already set the course to breach an agreement," where "an employer causes a breach rather than reacts to one." (DE 65 at 9). Here, Zimmer Biomet states that Land "committed to her breach by accepting a role with Keystone before [Zimmer Biomet] was able to assess its rights with respect to her new role." (DE 65 at 9). Zimmer Biomet emphasizes that the difference between the cases cited by Land and Land's own case is that Land accepted a position with Keystone Dental before she resigned from Zimmer Biomet, and she never inquired about Zimmer Biomet's position regarding her new employment with Keystone Dental.

Under Indiana law, "[t]he elements of equitable estoppel are: (1) a representation or concealment of a material fact, (2) made by a person with knowledge of the fact and with the

intention that the other party act upon it, (3) to a party ignorant of the fact, (4) which induces the other party to rely or act upon it to his detriment." *Clark v. Crowe*, 778 N.E.2d 835, 840 (Ind. Ct. App. 2002) (citing *Wabash Grain, Inc. v. Smith*, 700 N.E.2d 234, 237 (Ind. Ct. App. 1998)). Here, Land's acceptance of the position at Keystone Dental and resignation from her position at Zimmer Biomet occurred prior to almost all of the "actions and silence" by Zimmer Biomet on which she relies. As correctly pointed out by Zimmer Biomet, "Land is unable to provide this Court with *any* legal authority in support of her argument that, having already accepted a position with a competitor, she 'detrimentally relied' on any [Zimmer Biomet] act or omission." (DE 65 at 10). Indeed, common sense dictates that Land could not rely upon something that had not yet happened at the time Land made her decision to accept Keystone Dental's offer and resign from Zimmer Biomet.

The only actions by Zimmer Biomet listed by Land that took place before her decision were her conversations with Biomet's human resources manager while she was a regional manager, in which she was told that non-competition agreements were not enforceable in California. During the hearing, Land testified that "through the course of [her] regional manager position, [she] had heard numerous times that corporate understood that non-competes were not enforceable in California." (Tr. 288). Land also testified that, based on her conversations with Thea Bosio when some of Land's California sales representatives had left Biomet, "[i]t was [Land's] understanding that the company felt that they were not enforceable in California, that they, as a blanket policy, had everyone sign them, but they knew there was very little that they could do with California employees." (Tr. 288). It is of note that Land only discusses actions taken by Biomet and conversations with Biomet's human resources manager, all prior to

Biomet's merger with Zimmer.  Land does not address the fact that she signed the 2015

Agreement after the merger.  She does not explain why she thought that Biomet's actions prior to

the merger would dictate Zimmer Biomet's actions in enforcing the new, post-merger non-

competition agreement.  Additionally, she based her belief that Zimmer Biomet would not

enforce its non-competition covenant against her on Biomet's actions for sales representatives in

California, despite the fact that Land worked in many more states than only California.

Furthermore, Gerson's question to Land, at the time of her resignation from Zimmer

Biomet, regarding whether she would be working on institutional accounts for Keystone Dental,

was a sign to Land that Zimmer Biomet was concerned about her role with Keystone Dental.

Land's clear response that she had let Keystone Dental know that she could not work on those

accounts was also a sign that she recognized she had a duty not to compete.  There is nothing in

the record to explain how anything other than the 2015 Agreement was the basis for Land's

belief that she could not work on institutional accounts; absent the 2015 Agreement, there would

be nothing stopping Land from working on institutional accounts for Keystone Dental.

Additionally, Land had forwarded the 2015 Agreement to Keystone Dental, which had its

legal team review the contract.  Land received an email from Keystone on February 15, 2016—an

entire week before she resigned from Zimmer Biomet—which informed her that Keystone

Dental's lawyer had said that Zimmer Biomet could not enforce the non-compete agreement

against her.  (Pl. Ex. 25).  This fact, in particular, discredits Land's argument that she relied on

Zimmer Biomet's acts and omissions to her detriment.  While Land may not have thought that

Zimmer Biomet would enforce the 2015 Agreement against her, nothing Zimmer Biomet did

induced Land to that belief.  In fact, it seems more likely that Land relied upon Keystone

Dental's representation in reaching her belief that Zimmer Biomet would not enforce the 2015 Agreement against her.

Accordingly, Zimmer Biomet is not equitably estopped from enforcing the 2015 Agreement against Land.

### C. Reasonable Likelihood of Success on the Merits

At this stage of the proceedings, the court need not be certain about the outcome of the case. *See S.E.C. v. Lauer*, 52 F.3d 667, 671 (7th Cir. 1995) ("The case is before us on an appeal from the grant of a preliminary injunction, and as is too familiar to require citation such a grant is proper even if the district judge is uncertain about the defendant's liability."); *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996) (trial court "need not predict the eventual outcome on the merits with absolute assurance" at preliminary injunction stage). The plaintiff need only show a "reasonable likelihood" of success. *See St. John's*, 502 F.3d at 625. To assess the likelihood of success, the court looks to "standards provided by the substantive law." *Janvey v. Alguire*, 647 F.3d 585, 596 (5th Cir. 2011) (quoting *Roho, Inc. v. Marquis*, 902 F.2d 356, 358 (5th Cir. 1990)). The courts agree that a plaintiff must present a prima facie case according to those substantive standards. *See* 11A Charles Alan Wright et al., *Federal Practice & Procedure* § 2948.3 (3d ed.) (collecting authorities). Additionally, while the degree of likelihood of success a plaintiff needs to show may vary from case to case depending on the balance of harms, *see Abbott Labs.*, 971 F.2d at 12, a plaintiff must in all cases show *some* reasonable chance of success on the merits as a threshold matter, or its claim fails.

The substantive law governing this case is the law of the State of Indiana.[2]  In the 2015

Agreement, the parties agreed to submit to Indiana law regardless of any forum's choice-of-law

rules to the contrary.  (Pl. Ex. 18 ¶ 13).  That agreement is consistent with legal principle.  *See*

*generally* Restatement (2d) of Conflict of Laws § 187 (1971).  In Indiana, "[n]oncompetition

agreements or covenants not to compete are in restraint of trade and are not favored by the law."

*Gleeson v. Preferred Sourcing, LLC*, 883 N.E.2d 164, 172 (Ind. Ct. App. 2008) (citing *Cent. Ind.*

*Podiatry, P.C. v. Krueger*, 882 N.E.2d 723, 729 (Ind. 2008); *Titus v. Rheitone, Inc.*, 758 N.E.2d

85, 91-92 (Ind. Ct. App. 2001)).  Such a covenant will only be enforced where "the employer has

asserted a legitimate interest that may be protected," and where "the scope of the agreement is

reasonable in terms of time, geography, and types of activity prohibited."  *Id.* (citations omitted).

The parties dispute the likelihood that the 2015 Agreement will meet these requirements.

### *1.  Legitimate Protectible Interest*

All that Zimmer Biomet must do here is show that it has "some reason why it would be

unfair to allow the employee to compete with the former employer."  *Unger v. FFW Corp.*, 771

N.E.2d 1240, 1244 (Ind. Ct. App. 2002) (citing *Titus*, 758 N.E.2d at 92).  The 2015 Agreement is

designed to prevent an employee from using his or her knowledge of Zimmer Biomet's

confidential information to solicit business from Zimmer Biomet's customers or active prospects

in competition with Zimmer Biomet.  (Pl. Ex. 18 ¶ 7).  To allow an employee to leave

employment with Zimmer Biomet and then do those things immediately as an employee of a

---

[2] In the Report and Recommendation issued regarding Land's motion to transfer, or to dismiss in the alternative (DE 83), I found that the forum-selection clause in the 2015 Agreement is valid and enforceable, and thus Indiana law applies.  That discussion is incorporated here by reference to avoid needless repetition.

competitor would be unfair to Zimmer Biomet. Accordingly, this is a legitimate, protectible

interest. *See Zimmer, Inc. v. Masters*, No. 3:14-CV-312 RLM, 2014 WL 1317090, at *4 (N.D.

Ind. Mar. 31, 2014) (finding that the defendants' "advantageous personal contacts with Zimmer

customers amount to protectable goodwill"); *Krueger*, 882 N.E.2d at 729 ("Indiana courts have

held that 'the advantageous familiarity and personal contact which employees derive from

dealing with an employer's customers are elements of an employer's "good will" and are a

protectible interest which may justify a restraint.'" (citation omitted)); *Gleeson*, 883 N.E.2d at

173 (finding that the employer had "established a protectible interest in its customer

relationships"); *MacGill v. Reid*, 850 N.E.2d 926, 929 (Ind. Ct. App. 2006) ("In Indiana, the law

recognizes a protectible interest in the good will generated between a customer and a business."

(quoting *Norlund v. Faust*, 675 N.E.2d 1142, 1154 (Ind. Ct. App. 1997))).

 Land's main argument that Zimmer Biomet lacks a protectible interest in the 2015

Agreement is that her employment at Keystone Dental does not place either Zimmer Biomet's

confidential information or customer relationships at risk. Land focuses her arguments on her

contention that Zimmer Biomet has not shown that she has any "confidential" documents, as she

states that Zimmer Biomet failed to take reasonable steps to protect its information, which

defeats its claim that the information is "confidential." (DE 62 at 19-22). Land's arguments are

irrelevant to whether Zimmer Biomet has a legitimate protectible interest; under Indiana law,

Zimmer Biomet has a legitimate interest in preventing Land from stealing its clients or lending

an unfair competitive advantage to Keystone Dental no matter what information she uses to do

so, and the 2015 Agreement seeks to protect that broad interest. *See Zimmer US, Inc. v. Keefer*,

No. 3:12-CV-395-JD-CAN, 2012 WL 5268550, at *8 (N.D. Ind. Oct. 23, 2012) (citing *Hahn v.*

*Drees, Perugini & Co*, 581 N.E.2d 457, 460 (Ind. Ct. App. 1991)).  Zimmer Biomet is therefore reasonably likely to succeed on this point.

### 2. Reasonable Temporal Scope

Indiana courts have upheld time restrictions equal to and longer than the 18-month restriction contained in the 2015 Agreement.  *See Standard Register Co. v. Cleaver*, 30 F. Supp. 2d 1084, 1098 (N.D. Ind. 1998) (finding that a two-year restriction was reasonable); *Coffman v. Olson & Co., P.C.*, 906 N.E.2d 201, 208 (Ind. Ct. App. 2009) (same); *Gleeson*, 883 N.E.2d at 174 (finding an eighteen-month restriction to be reasonable).  "The fact that [the 2015] Agreement contains a provision tolling this period during any violation by [Land] does not change this result . . . ."  *Gleeson*, 883 N.E.2d at 174 (citing *Century Pers., Inc. v. Brummett*, 499 N.E.2d 1160, 1162 (Ind. Ct. App. 1986)).  Thus, the 2015 Agreement's 18-month restriction is reasonably likely to succeed.

### 3. Reasonable Geographic Scope

The 2015 Agreement limits Land's ability to compete with Zimmer Biomet within the "Restricted Territory," defined as

> (i) any Customer-specific or geographic territory assigned to, or covered by, Employee during Employee's last two (2) years of employment with Company; (ii) any state or portion of any state assigned to Employee by Company for purposes of any sales or service activities or responsibilities at any time during the two (2) years preceding the termination of Employee's employment with Company; or (iii) any county, municipality or parish of any state or commonwealth assigned to Employee or in which Employee engaged in any sales or service activities on behalf of Company at any time during the two (2) years preceding termination of Employee's employment with Company.

(Pl. Ex. 18 ¶ 7(a)(4)).  During the last two years of her employment with Zimmer Biomet, Land's

assigned geographic territory included Alaska, Arizona, California, Colorado, Hawaii, Idaho, Minnesota, Montana, Nevada, North Dakota, Oregon, South Dakota, Washington, Wisconsin, and Wyoming. (Tr. 39, 269). Thus, Land's "Restricted Territory" under the 2015 Agreement included a geographic restriction for the 15 states which she was assigned during the last two years of her employment with Zimmer Biomet.

Land, in her post-hearing briefing, does not dispute that the geographic region specified in the 2015 Agreement is reasonable. Nevertheless, I have considered the reasonableness of the scope of the geographic restriction, and Zimmer Biomet is reasonably likely to succeed on this issue as well. "Whether a geographic scope is reasonable depends on the interest of the employer that the restriction serves." *Buffkin v. Glacier Grp.*, 997 N.E.2d 1, 13 (Ind. Ct. App. 2013) (quoting *Krueger*, 882 N.E.2d at 730). Indiana courts have found certain geographic restrictions to be unreasonable, including restrictions barring work for competitors in the entire continental United States, *id.*; barring work for competitors anywhere in the entire United States, when the employee's "contacts were in a limited number of states," *Dicen v. New Sesco, Inc.*, 839 N.E.2d 684, 689 (Ind. 2005); and barring work for a specific competitor in any state in which that competitor does business, *Clark's Sales & Serv., Inc. v. Smith*, 4 N.E.3d 772, 783 (Ind. Ct. App. 2014). Geographic restrictions have been found reasonable by Indiana courts where they include the region where the employee established relationships, specifically where the legitimate interest is to protect the employer's existing and prospective customer relationships. *See Krueger*, 882 N.E.2d at 730-31 (finding that a geographic restriction was reasonable as to the counties where the employee had worked for the employer during the two years preceding his termination, but was "unreasonable to the extent it reaches contiguous counties"); *Gleeson*, 883 N.E.2d at 175

(finding that a 150-mile restriction was reasonable because it covered the area that the employee had solicited business for the former employer); *Zimmer, Inc. v. Sharpe*, No. 3:09-cv-00117-RLM-CAN, at 7-8 (N.D. Ind. Mar. 31, 2009), ECF No. 16 (finding a provision restricting "the territory . . . in which the Employee was responsible for cultivating or maintaining competitive advantages on Company's behalf" to be reasonable under Indiana law). While this Court previously found unreasonable a geographic restriction in an agreement between Zimmer and two employees, *Masters*, 2014 WL 1317090, at *7-8, that case involved employees who were not assigned to any particular territory, but rather handled certain client accounts.

Here, Land was assigned to and responsible for a certain geographic territory, and the 2015 Agreement's geographic restriction prohibited her from working for a competitor in only that same geographic territory. Zimmer Biomet is thus reasonably likely to succeed on this point.

### 4. Reasonable Types of Activity Prohibited

Land does not argue in her post-hearing briefing that the 2015 Agreement is unreasonable regarding the types of activity it prohibits. The 2015 Agreement does not prohibit Land from working for a competitor in any capacity, but only from working in a directly competitive capacity analogous to the one in which she worked for Zimmer Biomet. *See Gleeson*, 883 N.E.2d at 175-76 (holding that provisions are reasonable if they restrict future employment with a competitor to services provided during former employment). The 2015 Agreement does not prevent Land from working for a competitor in a different capacity from the one in which she worked for Zimmer Biomet during her last two years of employment. Zimmer Biomet is also reasonably likely to succeed on this issue.

## 5. Conclusion

For the reasons stated above, I find that Zimmer Biomet has shown a reasonable likelihood of success on the merits, in that the 2015 Agreement is enforceable because its terms are reasonable. Zimmer Biomet has asserted a legitimate protectible interest covered by the 2015 Agreement, and the scope of the 2015 Agreement is "reasonable in terms of time, geography, and types of activity prohibited." *Gleeson*, 883 N.E.2d at 172 (citations omitted). A reasonable likelihood of success on the merits is just one part of the analysis, however. Zimmer Biomet must still show that there are no adequate remedies at law; that it will suffer irreparable harm if the preliminary injunction is denied; that its irreparable harm without injunctive relief is greater than the harm Land will suffer if the preliminary injunction is granted; and that the preliminary injunction will not harm the public interest.

### B. Inadequacy of Remedies at Law

"Like other equitable remedies, injunctions were designed to offer relief when legal remedies were unavailable or inadequate to protect the parties' rights." *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 397 (7th Cir. 1984) (Swygert, J., dissenting). Here, there is no adequate remedy at law, because money damages will be both very difficult to calculate, and will almost certainly be inadequate to remedy the harm caused to Zimmer Biomet by Land's employment with Keystone Dental. The Indiana Supreme Court has held that it is "virtually impossible to quantify" the damage caused by an employee's breach of a non-competition agreement. *Krueger*, 882 N.E.2d at 733. For the same reasons, the Indiana Court of Appeals has consistently found that a preliminary injunction is the appropriate remedy for any such breach or threatened breach. *Id.* (collecting cases). Because it is unlikely that Zimmer Biomet will be able

to determine the full extent of harm resulting from Land's employment with its competitor, and because any attempt to calculate a monetary amount of damages will be largely speculative, it is evident that there is no adequate remedy at law in this case.

### C. Irreparable Harm

Land argues that no irreparable harm will occur to Zimmer Biomet if the preliminary injunction is denied. Land states that she has been working at Keystone Dental for several months, during which Zimmer Biomet has "not suffered any demonstrable or quantifiable harm," and there was no evidence presented at the hearing "that the future will be any different from the past." (DE 62 at 18). Land contends that Zimmer Biomet's "speculative *fear* that irreparable harm will occur is not enough to obtain a preliminary injunction." (DE 62 at 19). Land argues that Zimmer Biomet is not aware of a single customer they have lost due to Land, nor is Zimmer Biomet aware of a single piece of confidential information that Land has used or disclosed to Keystone Dental. (DE 62 at 19).

The irreparable harm requirement "does not mandate that the party demonstrate specific losses in its business." *AGS Capital Corp., Inc. v. Prod. Action Int'l, LLC*, 884 N.E.2d 294, 312 (Ind. Ct. App. 2008) (citing *Norlund*, 675 N.E.2d at 1149). If that was the requirement, then an injunction would rarely be appropriate, since the party harmed could quantify and ask for monetary relief. *Id.* Much of the harm that Land's employment for Keystone Dental will cause to Zimmer Biomet is "necessarily intangible—a loss of goodwill, a need to start over again on building personal relationships . . . , etc.—but that does not make it any less real. The fact that it cannot be quantified in a dollar amount is an argument in favor of equitable relief, not against it." *Keefer*, 2012 WL 5268550, at *12. Land is currently working for Zimmer Biomet's competitor,

and she has brought her knowledge of Zimmer Biomet's practices, customers, and strategy with her. Land's continued employment with a competitor in violation of the 2015 Agreement will cause irreparable harm to Zimmer Biomet.

### D. Balance of Harms

The potential harm to Zimmer Biomet if the preliminary injunction is not issued is great. Land is already working for a direct competitor, Keystone Dental, because she believed that the 2015 Agreement was not enforceable against her. She has contacted and offered Keystone Dental products to at least one customer she had interacted with while employed by Zimmer Biomet. (Pl. Ex. 52). Land also directed the Keystone Dental sales representatives who report to her to target Zimmer Biomet customers in two different emails. (Tr. 174; Pl. Ex. 45; Tr. 178; Pl. Ex. 48). Additionally, Land created a flash drive with 5,948 Zimmer Biomet files on it—including information that she admits was confidential—within a few days of Keystone Dental offering her a job, and she later accessed and used at least some of these documents during her employment with Keystone Dental. (Tr. 153-55, 171, 204-05, 312). The 15-state region that Land covered for Zimmer Biomet, which is a large portion of Zimmer Biomet's business in the United States, directly overlaps with the region she is now covering for Keystone Dental. Her knowledge of Zimmer Biomet's products and operations, combined with her experience and reputation within the community, could create a significant competitive advantage for Keystone Dental (indeed, this was likely part of the reason why Keystone Dental hired Land).

At the same time, enforcing the 2015 Agreement against Land would cause her significant harm, as she would not be able to continue her employment with Keystone Dental—at

least not in her current role and territory. However, at least to some extent Land can be said to have assumed this risk, since she signed the 2015 Agreement and brought it to Keystone Dental's attention prior to her resignation from Zimmer Biomet, even though she did not believe it was enforceable against her.

When balancing the harms, it is useful to refer back to the plaintiff's likelihood of success on the merits. *See Abbott Labs.*, 971 F.2d at 12 ("the more likely it is the plaintiff will succeed on the merits, the less the balance of irreparable harms need weigh towards its side; the less likely it is the plaintiff will succeed, the more the balance need weigh towards its side"). Here, Zimmer Biomet has a strong case and will likely succeed on the merits, so the balance of harms need not weigh heavily in its favor for a preliminary junction to issue.

The harm to Zimmer Biomet absent an injunction is likely to continue. Land argues that she has not targeted Zimmer Biomet customers for Keystone Dental and has not used her knowledge of Zimmer Biomet's confidential information or strategy to give Keystone Dental a competitive advantage, and thus contends that she is not a threat to Zimmer Biomet. The evidence presented at the hearing, however, contradicts this. Additionally, when asked at the evidentiary hearing whether she was "willing to commit that [she] won't personally solicit any of the accounts" for Zimmer Biomet customers, Land replied, "[i]f that's what's deemed by the Court, a hundred percent." (Tr. 324). Thus, it appears that a preliminary injunction issued by the Court is necessary for Land to comply with the terms of the 2015 Agreement. I find that the balance of harms weighs in favor of Zimmer Biomet.

### E. The Public Interest

The last question to be considered is whether the preliminary injunction will harm the public interest. *See St. John's*, 502 F.3d at 625. Non-competition agreements—at least when they are governed by Indiana law—are disfavored because they go against the public's interest in unrestrained trade. *See Gleeson*, 883 N.E.2d at 172 ("[n]oncompetition agreements or covenants not to compete are in restraint of trade and are not favored by the law"). But that concern is alleviated where "the employer has asserted a legitimate interest that may be protected[,]" and where "the scope of the agreement is reasonable in terms of time, geography, and types of activity prohibited." *Id.* In other words, where a non-competition agreement passes the legal tests and is enforceable, it is no longer against the public interest to enforce it. Furthermore, "there is a generalized public interest in enforcing contracts." *Turnell v. Centimark Corp.*, No. 13 C 2660, 2014 WL 3396490, at *5 (N.D. Ill. July 10, 2014) (citing *Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102 (3d Cir. 2010)). Accordingly, a preliminary injunction in this case would be consistent with the public interest.

### III. CONCLUSION

For these reasons, I RECOMMEND that Zimmer Biomet's Motion for Preliminary Injunction (DE 8) be GRANTED and that Land be preliminarily ENJOINED from continuing to work for Keystone Dental in her current role and territory and from making any further breaches of the 2015 Agreement.

The Clerk is directed to send a copy of this Report and Recommendation to counsel for the parties. NOTICE IS HEREBY GIVEN that within 14 days after being served with a copy of this recommended disposition, a party may serve and file specific, written objections to the

proposed findings or recommendations.  Fed. R. Civ. P. 72(b).  FAILURE TO FILE

OBJECTIONS WITHIN THE SPECIFIED TIME WAIVES THE RIGHT TO APPEAL THE

DISTRICT COURT'S ORDER.

Entered this 10th day of January 2017.

/s/ Susan Collins
Susan Collins,
United States Magistrate Judge